1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRITTNEY MATTHEWS-JONES,

                              Plaintiff,

      v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,[1]

                              Defendant.

Case No. 3:12-cv-05322-KLS

ORDER REVERSING AND
REMANDING DEFENDANT'S
DECISION TO DENY BENEFITS

Plaintiff has brought this matter for judicial review of defendant's denial of her

application for supplemental security income ("SSI") benefits.  Pursuant to 28 U.S.C. § 636(c),

Federal Rule of Civil Procedure 73 and Local Rule MJR 13, the parties have consented to have

this matter heard by the undersigned Magistrate Judge.  After reviewing the parties' briefs and

the remaining record, the Court hereby finds that for the reasons set forth below, defendant's

decision to deny benefits should be reversed and this matter should be remanded for further

administrative proceedings.

FACTUAL AND PROCEDURAL HISTORY

On April 22, 2009, plaintiff filed an application for SSI benefits, alleging disability as of

June 1, 2003, due to learning issues, mental retardation and cervical cancer.  See Administrative

Record ("AR") 18, 129, 140.  That application was denied upon initial administrative review on

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of the Social Security
Administration.  Therefore, under Federal Rule of Civil Procedure 25(d)(1), Carolyn W. Colvin is substituted for
Commissioner Michael J. Astrue as the Defendant in this suit.  **The Clerk of Court is directed to update the
docket accordingly.**

ORDER - 1

January 20, 2010, and on reconsideration on April 5, 2010. <u>See</u> AR 18, 78, 85.  A hearing was held before an administrative law judge ("ALJ") on June 14, 2011, at which plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. <u>See</u> AR 41-73.

In a decision dated July 7, 2011, the ALJ issued a decision in which plaintiff was determined to be not disabled. <u>See</u> AR 18-31.  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on February 10, 2012, making the ALJ's decision defendant's final decision. <u>See</u> AR 1; <u>see also</u> 20 C.F.R. § 416.1481.  On April 16, 2012, plaintiff filed a complaint in this Court seeking judicial review of defendant's decision. <u>See</u> ECF #1.  The administrative record was filed with the Court on August 9, 2012. <u>See</u> ECF #13.  The parties have completed their briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues defendant's decision should be reversed and remanded for an award of benefits, or in the alternative for further administrative proceedings, because the ALJ erred: (1) in evaluating the medical evidence in the record; (2) in assessing plaintiff's residual functional capacity; and (3) in finding her to be capable of performing other jobs existing in significant numbers in the national economy.  The Court agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, finds that while defendant's decision should be reversed, this matter should be remanded for further administrative proceedings.

DISCUSSION

The determination of the Commissioner of Social Security (the "Commissioner") that a claimant is not disabled must be upheld by the Court, if the "proper legal standards" have been applied by the Commissioner, and the "substantial evidence in the record as a whole supports" that determination. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986); <u>see also</u> <u>Batson v.</u>

ORDER - 2

Commissioner of Social Security Admin., 359 F.3d 1190, 1193 (9th Cir. 2004); Carr v. Sullivan, 772 F.Supp. 522, 525 (E.D. Wash. 1991) ("A decision supported by substantial evidence will, nevertheless, be set aside if the proper legal standards were not applied in weighing the evidence and making the decision.") (citing Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1987)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted); see also Batson, 359 F.3d at 1193 ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record.").  "The substantial evidence test requires that the reviewing court determine" whether the Commissioner's decision is "supported by more than a scintilla of evidence, although less than a preponderance of the evidence is required." Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).  "If the evidence admits of more than one rational interpretation," the Commissioner's decision must be upheld. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984) ("Where there is conflicting evidence sufficient to support either outcome, we must affirm the decision actually made.") (quoting Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971)). [2]

I.      The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and

---

[2] As the Ninth Circuit has further explained:

> . . . It is immaterial that the evidence in a case would permit a different conclusion than that which the [Commissioner] reached.  If the [Commissioner]'s findings are supported by substantial evidence, the courts are required to accept them.  It is the function of the [Commissioner], and not the court's to resolve conflicts in the evidence.  While the court may not try the case de novo, neither may it abdicate its traditional function of review.  It must scrutinize the record as a whole to determine whether the [Commissioner]'s conclusions are rational.  If they are . . . they must be upheld.

Sorenson, 514 F.2d at 1119 n.10.

conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981);

ORDER - 4

1   Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

2       In general, more weight is given to a treating physician's opinion than to the opinions of

3   those who do not treat the claimant. See Lester, 81 F.3d at 830.  On the other hand, an ALJ need

4   not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and

5   inadequately supported by clinical findings" or "by the record as a whole." Batson v.

6   Commissioner of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Thomas v.

7   Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.

8   2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a

9   nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may

10  constitute substantial evidence if "it is consistent with other independent evidence in the record."

11  Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

12      A.      Dr. Rubin

13      Plaintiff argues the ALJ erred in relying on the testimony of the medical expert, Stephen

14  Rubin, Ph.D., to find her capable of performing work.  The Court agrees.  The ALJ stated in her

15  decision that it was Dr. Rubin's opinion that plaintiff could learn "non-difficult and non-complex

16  jobs with some need for adjustment to go to work." AR 27.  In addition, the ALJ stated both that

17  Dr. Rubin was "convinced the record suggests she could function in a workplace" and that "it

18  was not impossible for her to work," though she "may have some difficulty depending on the job

19  and stress level." AR 27.  The ALJ also stated on the one hand that Dr. Rubin found the record

20  showed plaintiff was "in a transition phase of her life" in terms of her mental health conditions,

21  and therefore that any assumptions about what she could do in the work place "were speculative

22  and preliminary" (id.), and on the other hand that Dr. Rubin felt plaintiff's intermittent "extreme

23  periods of depression . . . could affect work attendance" – albeit that "was not certain" – but that

ORDER - 5

she "can do entry-level unskilled work" based on "the evidence as a whole" (AR 29).

Dr. Rubin's testimony regarding plaintiff's ability to function in a work setting, though, is

much more ambiguous and contradictory than the ALJ's findings indicate:

> . . . I don't know how she would do on a job at this point, I think that's an unknown ability at this point. I think she's capable of learning certainly non difficult or non complex jobs. I do think it would take an adjustment for her to go to work but I'm not convinced at this point that the record would suggest that she could not function on a job. I'd like to give her a chance to do that, I think she might be able to do that depending on the job and the stress level. I do think there would be some difficulties but I don't think it's impossible for her to work at this time.
>
> . . .
>
> . . . I think we're dealing with a young woman in a transition phase who also I think got pregnant, had a baby, has been involved in a relationship. I do think she has the symptoms, such as her depression and the PTSD. But I think it's very speculative to talk about how she would do in terms of social anxiety, such as working with co-workers, I think her ability to tolerate pressure. I do think that [the evidence from plaintiff's treating and examining medical sources] raises questions but I think it's fairly speculative only in a sense . . . This is a woman who was in special education. She was making a transition into adulthood. I do think, but I'd like, as I said, to see how she does before I conclude that she can't work. I think a lot of the characteristics relate out of lessons would suggest, you know, questions about ability to tolerate stress, about tolerating an eight hour day. I don't know, I do think that this is highly speculative in terms of marked or severe ratings at this point in terms of her functioning. I don't know, I'm more impressed with the fact that she has tried these things, has made attempts. She has been in treatment and I just wonder at this point if she is considerably more capable now than she was two years ago or three ago. I mean, I think these years have been important for her.

AR 51-52, 54. This testimony clearly shows Dr. Rubin was not *convinced* that the evidence in

the record suggested plaintiff could work. Indeed, Dr. Rubin expressly testified that he did *not*

know how she would do on a job. When contrasted with his additional statement that he did not

disagree with the conclusion that plaintiff "would be capable of entry-level, unskilled work," the

highly speculative nature of Dr. Rubin's own testimony becomes clear. AR 59. The reliance the

ALJ placed on that testimony to find plaintiff capable of working, therefore, is misplaced and not

ORDER - 6

1    well supported by the record.

2        B.    Marked to Severe Mental Functional Limitations/Inability to Work Assessments

3        Plaintiff also argues the ALJ erred in rejecting the opinions and assessments of some of

4    the treating and examining medical opinion sources in the record, in which she was assessed with

5    marked to severe mental functional limitations or was noted to be unable to perform full-time

6    work or other work-related activities.  The Court again agrees.  With respect to those opinions

7    and assessments, a psychological/psychiatric evaluation form was completed in early August

8    2008, by Arch Bradley, M.E.d, who found plaintiff had a number of moderate to marked mental

9    functional limitations based on a diagnosis of mild mental retardation, which he believed would

10   not be improved by mental health treatment.  See AR 303-05.

11

12       In early September 2008, another such form was completed by Kathleen Shormann,

13   MHP, who found plaintiff had a number of moderate to severe mental functional limitations

14   based on diagnoses of posttraumatic stress disorder ("PTSD") and a depressive disorder, but who

15   also stated plaintiff's symptoms would be sufficiently reduced by mental health treatment such

16   that she could be employed by the time she graduated high school.  See AR 560-62.  In early

17   November 2009, Christopher J. Clark, M.Ed., filled out a form titled "Document Request for

18   Medical or Disability Condition," in which he indicated plaintiff's mental health conditions

19   resulted in an inability to work or to participate in activities related to preparing or looking for

20   work.  AR 555.  However, Mr. Clark further indicated plaintiff would likely be so limited only

21   for a total of six months.  See AR 556.

22

23       In late April 2010, Lindsey Vaagen, MSW, filled out the same form, in which she

24   indicated that the issue of whether plaintiff's conditions limited her ability to work was

25   "[b]eyond [the] scope of assessment," but that they would limit to 11 to 20 hours per week her

26

ORDER - 7

ability to participate in activities related to preparing for and looking for work. AR 552.  On the

other hand, she also indicated plaintiff would be so limited for a period of only six months as

well.  See AR 553.  Another such form was completed by Ms. Shormann in early April 2011, in

which plaintiff's ability to work was found to be limited to 11 to 20 hours per week, but that

there were no limitations on the ability to participate in activities related to preparing or looking

for work caused by her mental impairments.  See AR 549.  Yet Ms. Shormann also indicated that

the number of weeks plaintiff would be so limited was "0".  AR 550.

　　　　With respect to this medical source opinion evidence, the ALJ found in relevant part:

> . . . [Dr. Rubin] testified the record revealed a woman in a transition phase of
> her life with symptoms of depression and [post traumatic stress disorder]
> PTSD.  However, it was purely speculative on making assumptions about
> what she would do with social anxiety, tolerating the pressures of a work
> environment, and or working with co-workers.  Dr. Rubin testified the severe
> and marked limitations opinions were speculative and preliminary with
> respect to her overall functioning. (See Ex. 1F, 2F, 26F)  There is a significant
> amount of evidence to show her initiative to try, her treatment efforts and that
> she is more capable than what was opined early in the record.  The
> undersigned also noted there was an inconsistency on whether she could work
> part time or whether she could not work at all.  As [state] examiners or an
> examiner upon intake, they did not constitute treating sources and the weight
> that can be accorded to their opinions regarding the claimant's ability to work
> is limited by the fact they are based upon one-time conclusory evaluations or
> checklists forms.  However, an ARNP did opine the claimant's conditions did
> not limit her ability to participate in activities related to preparing for and
> looking for work, which the undersigned considered to be suggesting she
> could work, corroborating Dr. Rubin's assertion. (Ex. 26F and 2F)  Yet, the
> weight accorded to the severe and marked limitation opinions is generally
> limited by the significant reliance they appeared to have placed upon the
> subjective allegations of an individual with documented credibility issues and
> secondary gain motivation who had been referred evaluations to determine
> entitlement to state general assistance benefits.  That would help explain the
> extreme variances between each opinion together with the fact she was
> pregnant or a new mother during one or more of those assessments.
> Furthermore, those examiners do not possess vocational expertise qualifying
> them to evaluate issues pertaining to "the work force."  The issue of an
> individual's capacity to perform work existing in significant numbers in the
> economy is ultimately reserved to the Commissioner of Social Security
> Administration for adjudication pursuant to the criteria of Social Security

Ruling 96-5p.

AR 27.  Plaintiff argues the ALJ erred in rejecting the opinions and functional assessments of

Ms. Vaagen, Mr. Clark, Mr. Bradley, and Ms. Shormann here.  See id. (citing record Exhibits 1F,

2F and 26F).  Again, the Court agrees.

First, there is little in Dr. Rubin's testimony that would support giving greater deference

to his opinions than to those medical sources who treated and examined plaintiff.  As plaintiff

points out and as noted above, Dr. Rubin's testimony itself was highly speculative concerning

the ability to work.  Further, rather than point to *other* independent evidence in the record not

consisting of the opinions and functional assessments of the treating and examining medical

sources themselves – or of evidence they were not aware of or did not consider – it appears Dr.

Rubin in large part merely relied on his "sense" of what the record showed:

> . . . Often there is a real division between those who see hundreds and
> hundreds of cases and tend to look overall at the record and those who are
> seeing the person in treatment, especially if the person is presenting with
> depression, PTSD symptoms.  It's really a very -- it's almost looking at a
> diamond from two different points of view.  I just have a sense in this case
> that the one seeing her for her symptoms are certainly seeing her isolated,
> seeing her depressed, seeing her flashbacks, her intrusive memories and
> wondering how she would be.  On the other hand, one wonders if she was
> working if the symptomology would be reduced, when she's staying home
> and not doing anything or just being with her baby it is quite
> possible that the symptoms are somewhat magnified and that working it may
> not show itself.  I don't think this woman really has been given a chance to
> demonstrate what she can learn and can do.  That's just my sense.  Like we're
> seeing two different views of the same person.

AR 55.  Much of Dr. Rubin's testimony, accordingly, appears to be pure conjecture.  In addition,

the fact that plaintiff's treating and examining medical sources were able to see her and how she

presented herself is one of the main reasons why their opinions are generally given more weight.

See Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1986) (opinions of treating physicians given

greater weight in part because those physicians "have a greater opportunity to know and observe

ORDER - 9

the patient as an individual"); see also 20 C.F.R. § 416.927(c)(2).  There is nothing to show that the same factors Dr. Rubin references that caused him to find the assessments and opinions of the above medical sources to be speculative were not also known to those sources at the time they saw plaintiff.  As such, the ALJ had no real or legitimate basis for preferring Dr. Rubin's conclusions over those of the other medical sources.

The ALJ's other stated reasons for rejecting the opinions and assessments of those other medical sources are also not well-supported.  For example, the ALJ fails point to the "significant amount of evidence [in the record] to show her initiative to try, [and] her treatment efforts" that she states shows plaintiff "is more capable than what was opined early in the record." AR 27.  In addition, while Mr. Bradley and Ms. Shormann may not be treating sources, Ms. Vaagen is and Mr. Clark appears to be.  Thus, this is not a valid basis for discounting *their* findings.  Further, Mr. Bradley and Ms. Shormann both examined plaintiff, as did Ms. Vaagen and Mr. Clark, and therefore their functional assessments in general still are entitled to greater weight than one who has not done so.[3]  Also, while there may be inconsistencies among the above medical opinions concerning the amount of work plaintiff can do, the ALJ did not attempt to resolve it – other than to speculate that it may due to their reliance on plaintiff's subjective complaints – or explain why such an inconsistency is sufficient to reject all of those opinions on this issue.

The fact that an examining medical source provides his or her opinion after only having

---

[3] While neither Mr. Bradley nor Ms. Shormann is technically an "acceptable medical source" such as a licensed physician and licensed or certified psychologist, each is an "other medical source," whose opinion nevertheless is considered to be "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the" record. Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 *3.  In addition, while "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals,' . . . depending on the particular facts in a case, . . . an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." Id. at *5.

ORDER - 10

seen a claimant one time also is not alone a valid basis for discounting that source's opinion. <u>See</u> AR 27.  In addition, each of the above medical sources except for Mr. Bradley has seen plaintiff on more than one occasion. <u>See</u> AR 252-57, 264-65, 282, 284-86, 471-78, 483, 542-45, 559-64, 601-06, 611, 614.  It is true that the Ninth Circuit has expressed its preference for individualized medical opinions over check-the-box forms. <u>See</u> <u>Murray v. Heckler</u>, 722 F.2d 499, 501 (9th Cir. 1983).  It also is true that the ALJ need not accept an opinion that is brief, conclusory, and inadequately supported by clinical findings. <u>See</u> <u>Batson</u>, 359 F3d at 1195.  While the opinions and functional assessments the above medical sources provide do have boxes that are checked – and some of their comments when read alone certainly could be deemed to be conclusory – the ALJ failed to consider them in their proper context.

It is true, for example, that Ms. Vaagen did not provide much, if any, in the way of actual clinical findings to support her conclusions on the actual form that contained those conclusions. <u>See</u> AR 552-54.  The record, however, contains several progress notes she completed over time that could have provided such support, but which the ALJ apparently failed to consider. <u>See</u> AR 27, 252-57, 264-65, 282, 284-86, 483, 542-45, 604, 611, 614; <u>see</u> <u>also</u> <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1232 (9th Cir. 1987 (opinion based on clinical observations supporting diagnosis of depression is competent psychiatric evidence).  Similarly, the record includes a report of an evaluation conducted by Mr. Clark, which includes a mental status examination of plaintiff, dated the same day as his opinion regarding her ability to work. <u>See</u> AR 471-78, 555-57; <u>see</u> <u>also</u> <u>Clester v. Apfel</u>, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) (mental status examination results provide basis for diagnosis of psychiatric disorder just as results of physical examination provide basis for physical illness diagnosis).

As for Mr. Bradley, although the evaluation form he completed does not contain a mental

ORDER - 11

status examination, it cites psychological testing results (see AR 304), which constitutes potential

objective clinical support for his functional assessment as well.  Ms. Shormann's early

September 2008 evaluation form for that matter – like the report accompanying the opinion from

Mr. Clark – includes a mental status examination, which again constitutes objective clinical

findings.  See AR 563-64.  The record also contains progress notes from Ms. Shormann, which

the ALJ once more appears to not have considered here.  See AR 605-06.  Given that the ALJ did

not address any of this potential evidentiary support for the above assessments and opinions, her

determination regarding their conclusory nature is premature.

     In addition, it is far from clear from the above pages of the record that more reliance was

placed on those complaints as opposed to the other, objective clinical evidentiary support just

discussed.  See Morgan, 169 F.3d 595, 601 (9th Cir. 1999) (medical opinion premised to large

extent on claimant's own accounts of her symptoms and limitations may be disregarded where

those complaints have been properly discounted); see also Tonapetyan, 242 F.3d at 1149.  Lastly,

it is true that the above medical sources may not possess the "vocational expertise qualifying

them to evaluate issues pertaining to 'the work force'" (AR 27) that, say, the vocational expert

called to testify at the administrative hearing in this case has.  However, their opinions on the

issue of plaintiff's ability to perform specific work-related functions – including the length of

time that she can perform them –constitutes significant probative evidence the ALJ is required to

consider.  As just discussed, though, this the ALJ did not properly do.

     C.    Global Assessment of Functioning Scores

     Plaintiff takes issue as well with the ALJ's treatment of the various global assessment of

functioning ("GAF") scores given by her treating and examining medical sources, with respect to

ORDER - 12

which the record shows that in late September 2007, Ms. Vaagen assigned a GAF score of 48.[4]

See AR 255.  That same GAF score was given by Sandy Birdlebough, Ph.D., in early November

2007, and again by Dr. Birdlebough in mid-December 2007, and once more by Ms. Vaagen in

early February 2008. See AR 250, 258, 287.

In early January 2009, plaintiff was evaluated by Jay M. Toews, Ed.D., who assigned a

GAF score of 65+.[5] See AR 388.  In early November 2009, Mr. Clark gave her a current GAF

score of 45, also finding that score to have been the highest in the past year. See AR 477.  In late

December 2009, Roland Dougherty, Ph.D., also evaluated plaintiff and gave her a GAF score of

50. See AR 496.  Lastly, in early March 2011, Mr. Clark gave plaintiff a GAF score of 45, both

current and the highest in the past year. See AR 602.

With regard to the above scores, the ALJ found in relevant part:

> The undersigned also considered the assigned global assessment of function
> (GAF) scores in the record and they span from 45 to 65, which suggests
> serious to mild difficulties in social, occupational, or school functioning.  For
> reasons to be set forth in detail in this decision, the claimant's subjective
> allegations of record are not found to be the most reliable evidence of record
> upon which to base an assessment of her residual functional capacity.
> Therefore, the lower scores based on the self-reports of the claimant to remain
> eligible for state public assistance or receive a service are accorded less
> weight than those assigned GAF scores from objective medical providers and
> treatment providers.  Those evaluators tended to assign a mild or moderate
> limitation, which the undersigned considered in the residual functional
> capacity in this decision.  In addition, mental health providers did not
> reevaluate the claimant in 2009 due to her pregnancy and other factors, as they

---

[4] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (citation omitted).  "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Id. (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious impairment in occupational functioning.").

[5] "A GAF score of 61-70 reflects mild symptoms or "some difficulty[in social, occupational, or school functioning], but the individual 'generally function[s] pretty well.'" Sims v. Barnhart, 309 F.3d 424, 427 n.5 (7th Cir. 2002) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994)).

ORDER - 13

> readmitted her under the same diagnoses in the last treatment period.
> Therefore, there was no change or attempts at reevaluating the claimant to vet
> out any differences or improvements in the lower assigned GAF scores.

AR 28.  The ALJ further noted the GAF score of 50 assigned by Dr. Dougherty, but apparently discounted this score as well on the basis that Dr. Dougherty "also stated the functioning during the examination [he performed] did not suggest she was mildly mentally retarded." Id.

Plaintiff notes that the GAF scores with which she has been provided have been largely consistent with each other and show her functional state over time, and thus she argues that the ALJ could not ignore them "simply because" Dr. Toews assigned a higher one. ECF #15, p. 19. The Court agrees that the ALJ erred in discounting the above scores based on the GAF scores assigned by the "objective medical providers and treatment providers in the record" who "tended to assign a mild or moderate limitation" (AR 28), given that as plaintiff points out only one such medical provider assigned a GAF score indicative of mild or moderation limitation.  The Court also finds improper the ALJ's rejection of the lower GAF scores on the basis that they may have been provided in the context of plaintiff's attempts to remain eligible for state public assistance benefits or other services, as the ALJ cites no specific evidence that this in fact had an impact on the veracity of the GAF scores or the information on which they are based.

The fact that the above medical sources may not have re-evaluated plaintiff following her pregnancy, furthermore, also is not a valid reason for discounting those sources' GAF scores, as the ALJ again cites no specific evidence in the record that the scores would have been different, and therefore seems to be purely speculative on the ALJ's part.  On the other hand, the ALJ did not err in rejecting the above GAF scores on the basis that the ALJ did not find plaintiff's claims of disabling symptoms and limitations "to be the most reliable evidence of record upon which to base an assessment of her residual functional capacity." AR 28.

ORDER - 14

A GAF score is "a *subjective* determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (citation omitted) (emphasis added). Thus, while a GAF score is "relevant evidence" of a claimant's ability to function mentally, it is reasonable to discount a GAF score on the basis of the claimant's own lack of credibility. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). In this case, the ALJ discounted plaintiff's credibility regarding her subjective complaints and allegations of disability. See AR 26, 28. Since plaintiff has not specifically challenged that credibility determination, it will not be overturned here. See Paladin Associates., Inc. v. Montana Power Co., 328 F.3d 1145, 1164 (9th Cir. 2003) (by failing to make argument in opening brief, objection to court's order was waived); Kim v. Kang, 154 F.3d 996, 1000 (9th Cir.1998) (matters not specifically and distinctly argued in opening brief ordinarily will not be considered). Accordingly, the ALJ did not err in rejecting the lower GAF scores in the record on this basis.

D.      Consultative Examining Medical Sources

Plaintiff asserts error in regard to the weight the ALJ gave to the other examining medical sources in the record, who did not find the level of mental functional limitation the above sources found. In early January 2009, plaintiff was evaluated by Mr. Toews, who concluded as follows concerning her ability to function:

> . . . She is able to comprehend, remember and execute 2-3 step instructions. She is capable of functioning in a wide range of routine and repetitive types of employment. She may have mild difficulty interacting with coworkers because she is manipulative and possibly solicitous. She would have significant difficulty dealing with the general public. I suspect she would not be able to cope with stress.

AR 388. As discussed above, Mr. Toews also gave plaintiff a GAF score of 65+. See id. In late December 2009, a report of psychological examination was provided by Dr. Dougherty, who

ORDER - 15

1   also as discussed above gave plaintiff a GAF score of 50. See AR 496. Dr. Dougherty further

2   opined that she might "have difficulty relating to others on the job" and "be quite manipulative,"

3   and she was "not likely to tolerate frustration and stress well." AR 497. However, he believed

4   "she should be able to understand and carry out simple tasks." Id.

5          With respect to Mr. Toews and Dr. Dougherty, the ALJ found in relevant part:

6          . . . The undersigned accorded great weight to the consultative examiner
           opinions. They are acceptable medical sources, were not generated for the
7          basis of remaining eligible for public assistance, were not unduly influenced
           by the claimant's self-reports or from a patient advocate who may sympathize
8          with claimant for one reason or another, and is consistent with other
           evidence. (See Ex. 6F and 18F) The undersigned considered the assigned
9          GAF scores indicating moderate symptoms or any moderate difficulty in
           social, occupational, or school functioning in the residual functional capacity
10         and this decision. Therefore, it is proper to conclude she can work in
           proximity of others but not in close cooperation with others. In addition, the
11         evidence supported her ability to respond appropriately to supervision, co-
           workers, and in an unskilled entry-level work environment.
12

13  AR 28-29. The Court agrees with plaintiff that the ALJ failed to provide sufficient reasons here

14  for giving greater weight to these two medical sources. First, as just discussed the ALJ failed to

15  point to any specific evidence in the record of impropriety or lack of veracity in regard to those

16  medical opinions or GAF scores that were provided in the context of plaintiff's attempts to gain

17  access to state public assistance or other benefits. Nor, also as discussed above, is it at all clear

18  that the other treating and examining medical sources in the record relied primarily on plaintiff's

19  own self-reports rather than on their own clinical findings. In addition, notwithstanding the fact

20  that the ALJ was not remiss in discounting the lower GAF scores in light of their subjectivity and

21  plaintiff's adverse credibility determination, the ALJ did not explain how the one GAF score in

22  the record indicating mild or moderate symptoms assessed by Dr. Dougherty is any more reliable

23  than the other assigned GAF scores.

24         In addition, while the ALJ appears to have adopted some of the functional limitations Mr.

ORDER - 16

Toews and Dr. Dougherty found, she did not explain why others were ignored or rejected.  For

example, although as noted above Mr. Toews "suspect[ed plaintiff] would not be able to cope

with stress" (AR 388), the ALJ assessed no limitation in that area (see AR 23-24).  Likewise, the

ALJ did not address or incorporate Dr. Dougherty's conclusion that plaintiff was "not likely to

tolerate frustration and stress well." AR 497.  For all of the above reasons, therefore, the Court

finds the ALJ erred in giving the weight to this medical opinion evidence that she did.

II.      The ALJ's Assessment of Plaintiff's Residual Functional Capacity

         Defendant employs a five-step "sequential evaluation process" to determine whether a

claimant is disabled. See 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled

at any particular step thereof, the disability determination is made at that step, and the sequential

evaluation process ends. See id.  If a disability determination "cannot be made on the basis of

medical factors alone at step three of that process," the ALJ must identify the claimant's

"functional limitations and restrictions" and assess his or her "remaining capacities for work-

related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity

("RFC") assessment is used at step four to determine whether he or she can do his or her past

relevant work, and at step five to determine whether he or she can do other work. See id.

         Residual functional capacity thus is what the claimant "can still do despite his or her

limitations." Id.  It is the maximum amount of work the claimant is able to perform based on all

of the relevant evidence in the record. See id.  However, an inability to work must result from the

claimant's "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

limitations and restrictions "attributable to medically determinable impairments." Id.  In

assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent

ORDER - 17

1   with the medical or other evidence." Id. at *7.

2      The ALJ in this case determined that plaintiff had the residual functional capacity:

3      **. . . to perform a full range of work at all exertional levels but with the**
4      **following nonexertional limitations: the claimant should avoid extreme**
       **hot and cold temperatures, humidity, wetness, fumes, gases, odors and**
5      **other respiratory irritants due to her asthma condition.  Moreover, the**
       **claimant is capable of understanding, carrying out, and remembering**
6      **simple instructions.  She can work in proximity of others but not in close**
       **cooperation with others.  She can respond appropriately to supervision,**
7      **co-workers, and usual work settings.  Last, the claimant can perform**
       **unskilled entry-level work.**
8

9   AR 23-24 (emphasis in original).  In so determining, the ALJ found in relevant part as follows:

10     The undersigned affirms the mental residual functional capacity conclusions
       reached by the [non-examining, consultative] physicians and/or [sic]
11     employed by the state disability determination services supporting a finding of
       'not disabled.' (See Ex. 7F, 8F, 9F, 15F, 16F, 20F, 21F, 24F, 25F)  Although
12     those physicians were non-examining and therefore their opinions do not as a
       general matter deserve as much weight as those of examining or treating
13     physicians, those opinions do deserve some weight, particularly in a case like
       this in which there exist a number of other reasons to reach similar
14     conclusions, as explained throughout this decision.
15

16  AR 29.  Among the conclusions the ALJ referenced here are those from Eugene Kester, M.D.,

17  which include the statement that plaintiff's impairments "would prevent her from learning new

18  and complex material as well as sustaining" concentration, persistence and pace. AR 414.  The

19  RFC assessment the ALJ provided, however, does not encompass the limitations on learning new

20  tasks and on sustaining concentration, persistence.  Accordingly, the Court agrees the ALJ failed

21  to properly account for these assessed limitations.[6]

22

23  _____

24  [6] Those limitations are contained in Section III ("FUNCTIONAL CAPACITY ASSESSMENT") of the mental
    residual functional capacity assessment ("MRFCA") form Dr. Kester completed. See AR 414.  Plaintiff argues the
    ALJ also erred by not including in her RFC assessment the specific moderate limitations Dr. Kester checked off in
25  Section I ("SUMMARY CONCLUSIONS") of that form. See AR 412-13.  Pursuant to the directive contained in the
    Program Operations Manual System ("POMS"),however, "**[i]t is the narrative written by the psychiatrist or**
26  **psychologist in [S]ection III . . . that adjudicators are to use as the assessment of RFC.**" POMS DI
    25020.010(B)(1), https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010!opendocument (emphasis in original).
    While the POMS "does not have the force of law," it has been recognized as "persuasive authority" in the Ninth

There also are problems with the ALJ's reliance on the other referenced conclusions.  For example, one of those "conclusions" consists of an incomplete psychiatric review technique form that contains no assessed mental functional limitations.  See AR 458-68.  Another one states that there is "[i]nsufficient evidence [in the record] for [a disability] decision." AR 456.  A third one is from Beth Fitterer, Ph.D., who opined that plaintiff's "[s]ustained attention and pace [would be] periodically affected by depression, anxiety, and personality characteristics."[7] AR 536.  The ALJ again, though, included no restriction on attention and pace.  Given the ALJ's failure to properly address these assessed limitations – and the other errors the ALJ made in evaluating the medical evidence in the record discussed above – it cannot be said at this time that the ALJ's assessment of plaintiff's residual functional capacity is completely accurate, and therefore it cannot be upheld.

III.   The ALJ's Findings at Step Five

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987);

---

Circuit. Warre v. Commissioner of Social Sec. Admin., 439 F.3d 1001, 1005 (9th Cir. 2006).  Nor does the Court find any valid reasons for not following that directive in this case.  As such, the ALJ was not required – and thus did not err in failing – to address or adopt those limitations in her decision.

[7] As with Dr. Kester, this conclusion is contained in Section III of the MRFCA form she completed.  Also as with Dr. Kester, the ALJ was not required to address or adopt the other specific moderate limitations Dr. Fitterer checked off in Section I of that form.

ORDER - 19

1   Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony

2   therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See

3   Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the

4   claimant's disability "must be accurate, detailed, and supported by the medical record." Id.

5   (citations omitted).  The ALJ, however, may omit from that description those limitations he or

6   she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

7

8           At the hearing, the ALJ posed a hypothetical question to the vocational expert containing

9   substantially the same limitations as were included in the ALJ's assessment of plaintiff's residual

10  functional capacity. See AR 67-68.  In response to that question, the vocational expert testified

11  that an individual with those limitations – and with the same age, education and work experience

12  as plaintiff – would be able to perform other jobs. See AR 69-70.  Based on the testimony of the

13  vocational expert, the ALJ found plaintiff would be capable of performing other jobs existing in

14  significant numbers in the national economy. See AR 30-31.

15

16          Plaintiff argues the ALJ erred in posing the hypothetical question that she did, because it

17  did not include all of the functional limitations assessed by the treating and examining providers

18  in the record.  Because as discussed above the ALJ erred in evaluating the medical evidence in

19  the record – and thus in assessing plaintiff's residual functional capacity – the Court agrees that

20  the hypothetical question cannot be said to be wholly accurate at this time.  Accordingly, the ALJ

21  erred in finding plaintiff to be capable of performing other jobs and therefore not disabled at step

22  five of the sequential disability evaluation process.

23

24          The Court disagrees, however, that the ALJ erred in failing to include in the hypothetical

25  question the specific moderate mental functional limitations Dr. Kester checked off in Section I

26  of the MRFCA form he completed, for the same reasons the ALJ did not err in failing to include

ORDER - 20

them in her assessment of plaintiff's RFC.  On the other hand, the vocational expert testified that

he did not think the hypothetical individual "would be able to maintain competitive employment

if [he or she] only ha[s] access to unskilled work and would have to stay focused." AR 72.  This

was in response to how limitations that prevented the individual from learning new and complex

tasks and from sustaining concentration, persistence and pace would affect his or her ability to

work, or in other words the limitations noted above that Dr. Kester set forth in Section III of the

MRFCA form. See id.  Thus, this testimony too makes reliance on the hypothetical question the

ALJ posed improper as well.

IV.     This Matter Should Be Remanded for Further Administrative Proceedings

        The Court may remand this case "either for additional evidence and findings or to award

benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the

proper course, except in rare circumstances, is to remand to the agency for additional

investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations

omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is

unable to perform gainful employment in the national economy," that "remand for an immediate

award of benefits is appropriate." Id.

        Benefits may be awarded where "the record has been fully developed" and "further

administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan

v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded

where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the
> claimant's] evidence, (2) there are no outstanding issues that must be resolved
> before a determination of disability can be made, and (3) it is clear from the
> record that the ALJ would be required to find the claimant disabled were such
> evidence credited.

ORDER - 21

1    Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).

2    Because issues still remain in regard to the medical evidence in the record concerning plaintiff's

3    mental impairments and limitations, and therefore in regard to her residual functional capacity

4    and ability to perform other jobs existing in significant numbers in the national economy, remand

5    for further administrative proceedings is appropriate.

6         Plaintiff argues that remand for payment of benefits is warranted based on the vocational

7    expert's additional testimony, given that the ALJ "explicitly accepted" Dr. Kester's assessment.

8    ECF #15, p. 22.  The Court disagrees.  First, it is not entirely clear that the ALJ was accepting all

9    aspects of Dr. Kester's functional assessment.  For example, the ALJ merely stated she was

10   affirming those "residual functional capacity conclusions reached [by Dr. Kester] supporting a

11   finding of 'not disabled.'" AR 29.  In addition, while the ALJ clearly gave weight to those

12   conclusions, she stated she was only giving them "some" weight. Id.  Regardless, the Court finds

13   the weight of the evidence in the record, both medical and otherwise, indicates that remand for

14   an award of benefits is not warranted at this time.

15        Where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a

16   treating or examining physician," that opinion generally is credited "as a matter of law." Lester,

17   81 F.3d at 834 (citation omitted).  However, where the ALJ is not required to find the claimant

18   disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and

19   thus the Smolen test will not be found to have been met. Bunnell v. Barnhart, 336 F.3d 1112,

20   1116 (9th Cir. 2003).  In this case, as discussed above, the medical evidence is split on whether

21   plaintiff's mental impairments have resulted in functional limitations indicative of an inability to

22   perform any work.  Indeed, also as discussed above, even a portion of the evidence indicative of

23   an inability to perform full-time work itself is not fully consistent.

ORDER - 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Once more as discussed above, plaintiff has not shown the ALJ erred in rejecting all of the medical evidence in the record indicative of disability, such as, for example, the lower GAF scores assessed by the treating and examining medical sources in the record.  In addition, as further discussed above plaintiff has failed to show any error in the ALJ's adverse credibility determination, which has a strong bearing on the veracity of plaintiff's allegations of disability.  For all of these reasons, remand for additional administrative proceedings rather than an outright award of benefits is appropriate in this case.

CONCLUSION

Based on the foregoing discussion, the Court hereby finds the ALJ improperly concluded plaintiff was not disabled.  Accordingly, defendant's decision is REVERSED and this matter is REMANDED for further administrative proceedings in accordance with the findings contained herein.

DATED this 13th day of March, 2013.

Karen L. Strombom
United States Magistrate Judge

ORDER - 23